**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIELLE WILLIAMS,
on behalf of Plaintiff and
the class members described below,

        Plaintiff,

   vs.

OPPORTUNITY FINANCIAL, LLC,
TODD G. SCHWARTZ and
PAMELA D. JOHNSON,

        Defendants.

## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.     Plaintiff Danielle Williams brings this action against Opportunity Financial, LLC, and its two managers and executives, Todd G. Schwartz and Pamela D. Johnson,  to obtain redress from usurious loans arranged by Opportunity Financial, LLC.

2.     Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction under 28 U.S.C. §1331, 18 U.S.C. §1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

4.     This Court has personal jurisdiction over each Defendant because they are located in Illinois.

5.     Article III of the Constitution of the United States is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and

1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

6. Plaintiff is a citizen of Indiana and a resident of Indianapolis.

7. Defendant Opportunity Financial, LLC is a Delaware limited liability company with its principal place of business at 130 E. Randolph, Ste. 3400, Chicago, IL 60601. Its registered agent and office is Cogency Global Inc., 600 South Second St., Suite 404, Springfield, IL 62704-2542.

8. Defendant Opportunity Financial, LLC has two managers, Defendants Todd G. Schwartz and Pamela D. Johnson, both of whom may be found at 130 E. Randolph, Ste. 3400, Chicago, IL 60601.

9. Defendant Todd G. Schwartz is the Chief Executive Officer of Defendant Opportunity Financial, LLC and functions as such.

10. Defendant Pamela D. Johnson is the Chief Financial Officer of Defendant Opportunity Financial, LLC and functions as such.

11. Defendants Todd G. Schwartz and Pamela D. Johnson formulated the lending practices at issue herein, obtained capital for the loans, and direct the making and collection of the loans.

12. According to the annual report on SEC Form 10-K filed by OppFi, Inc., the public parent of Opportunity Financial, LLC, for the year ending Dec. 31, 2022 (original page 32), "Our success significantly depends on the continued service of our senior management team, including Todd Schwartz, our Chief Executive Officer, Pamela Johnson, our Chief Financial Officer, and other highly skilled personnel."

-2-

## FACTS

13.     On or about March 4, 2024, Plaintiff obtained a $1,800 loan from Defendant Opportunity Financial, LLC, via the Internet.  A copy of the loan agreement is attached as Exhibit A.  Plaintiff obtained the loan for personal, family or household purposes.

14.     The loan had an interest rate of 159.24%.

15.     This rate is typical of the rates charged by Opportunity Financial, LLC to residents of Indiana.

16.     All charged by Opportunity Financial, LLC to residents of Indiana exceed 72% per annum.

17.     The loan was nominally made by Capital Community Bank.

18.     Plaintiff disclosed her Indiana address on the loan application.

19.     Plaintiff has paid usurious interest.

## HOW OPPORTUNITY FINANCIAL, LLC ARRANGES LOANS

20.     According to the annual report on SEC Form 10-K filed by OppFi, Inc., the public parent of Opportunity Financial, LLC, for the year ending Dec. 31, 2022 (original pages 10-11), Opportunity Financial, LLC uses a "Bank Partner Model," described as follows:

> OppFi employs two models, bank partner and direct. In the bank partner model, the bank uses the OppFi technology platform to provide its loan products to consumers where OppFi facilitates the process and the loan products are funded directly by the bank. In the direct origination model, applicants who apply and obtain a loan through OppFi's online platform are underwritten, approved, and funded directly by OppFi.
>
> The bank lending product leverages OppFi's marketing and servicing expertise and the banks' broad national presence to facilitate credit access in 35 states or approximately 70% of the U.S. population. This relationship operates much akin to the "Managing General Agent" relationship with an insurance carrier. Additionally, this model has been tested in the credit card and mortgage industries and is a key growth enabler for the business. Similar to the Managing General Agent insurance relationship, OppFi manages many aspects of the loan life cycle on behalf of its bank partners, including customer acquisition, underwriting and loan servicing. This relationship allows OppFi's bank partners to leverage OppFi's digital acquisition, machine learning underwriting and highly-rated customer service capabilities, which they would otherwise need to develop in-house. OppFi's bank partners use their own capital to originate loans. OppFi's bank partners are FinWise Bank ("Finwise"), First Electronic Bank ("FEB"), and Capital Community Bank ("CCB").
>
> In the year ended December 31, 2022, approximately 95% of OppFi's net originations were

generated from loans originated by its bank partners and facilitated by the OppFi platform. Finwise, FEB and CCB began originating loans on the OppFi platform in January 2018, May 2020 and October 2020, respectively.

OppFi has entered into separate agreements with each of its three bank partners. OppFi's agreements with its bank partners are nonexclusive, generally have 60-month terms and certain agreements automatically renew, subject to certain early termination provisions and minimum fee amounts, and do not include any minimum origination obligations or origination limits. OppFi's bank partners generally retain approval rights on all aspects of the program and are primarily responsible for regulatory and compliance oversight.

Under the bank partner model, OppFi is compensated by the bank partner as a service provider for OppFi's role in delivering the technology and services to the bank partner to facilitate origination and servicing of loans throughout each loan's lifecycle. Customers who meet the underwriting criteria for multiple bank partners are referred to a specific bank partner randomly based on a computer algorithm and volume targets set with each bank partner. OppFi's bank partners generally hold loans originated on our platform for typically two to three days following origination. OppFi acquires participation rights in such loans ranging from 95% to 100% of the loan. OppFi and its bank partners each pay or reimburse each other for certain fees and costs that are immaterial in amount.

The economic difference to OppFi in loans originated via the bank partnership model as compared to the direct origination model are immaterial and generally result from a minimal program fee paid to OppFi for each origination as well as increased compliance costs for OppFi, which collectively have an insignificant impact on OppFi's customer lifetime value. OppFi has shifted towards the bank partner model as the percentage of Total Net Originations by OppFi's bank partners has increased from 91% for the year ended December 31, 2021 to 95% for the year ended December 31, 2022. OppFi has shifted to the bank partner model because its bank partners operate under federal law, which allows them to lend nationally based on their state domicile and facilitates a national product offering for the consumer while also streamlining regulatory requirements and compliance infrastructure.

21. The percentage of loans originated using the "bank partner model" subsequently increased to 98%.

22. The original agreement between Opportunity Financial, LLC and Capital Community Bank, the "bank partner" involved in the loan to Plaintiff, is in Exhibit B. An amendment is in Exhibit C. Arrangements with other "bank partners" are similar.

23. Opportunity Financial, LLC thus obtains the predominant economic interest in the loan, i.e., 95% to 100%.

24. Opportunity Financial, LLC markets, brokers, arranges, and facilitates the loan and has the right to obtain the 95% to 100% interest in the loans.

25. Opportunity Financial, LLC predominantly designs, controls, or operates the loan

program, i.e., "deliver[s] the technology and services to the bank partner to facilitate origination and servicing of loans throughout each loan's lifecycle".

26.     Opportunity Financial, LLC engaged in "direct origination" of some loans, but "shifted towards the bank partner model" in order to avoid state interest caps, i.e., "because its bank partners operate under federal law, which allows them to lend nationally based on their state domicile."  It thus "purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states."

27.     Opportunity Financial, LLC pays Capital Community Bank a small, guaranteed fee for each loan originated.  Capital Community Bank stands to lose virtually nothing if a loan goes bad and stands to gain practically nothing if a loan is repaid.

28.     Capital Community Bank has a website that offers its customers personal loans, https://ccbank.com/personal-loans, but it does not mention the high-interest loans at issue here. These can only be obtained through Opportunity Financial, LLC, and not through Capital Community Bank.

### EXTENT OF LENDING ACTIVITIES AT ISSUE

29.     Opportunity Financial, LLC had $457 million in receivables outstanding at the end of 2022.  On information and belief, more than 2.5% (at least $10 million) were made to Indiana residents.

30.     The financial statements of Capital Community Bank disclose net operating income of less than $7 million, including not only income from the loans at issue but its own banking operations.

31.     In an attempt to evade Indiana law, Opportunity Financial, LLC's agreements provide for arbitration and require the arbitrator to apply Utah law, which does not limit interest rates.

32.     Such provision is an impermissible prospective waiver of statutory rights under Indiana law and otherwise, and is invalid.

## <u>INDIANA REGULATION OF LENDING</u>

33.     The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes

a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

34.     For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

35.     With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind.

Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

36.     There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it

requires that small loans conform to other requirements that Defendants' loans do not comply with.

37.     Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to

-6-

fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

38.     The amount of finance charge provided for in <u>Exhibit A</u> exceeds that permitted in Indiana under any provision.

39.     Ind. Code Ann. § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

    (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

    (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

    (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

    (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether

approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

> (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

> (a) An agreement that the law of another state shall apply.

> (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

> (c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24.4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24.4.5-5-202.

40.     Ind. Code 24.4.5-1-107 prohibits waiver by the consumer of rights under the

Uniform Consumer Credit Code:

> Waiver — Agreement to forego rights — Settlement of claims.

> (1)     Except as otherwise provided in this Article, a buyer, lessee, or debtor may not waive or agree to forego rights or benefits under this Article.

> (2)     A claim by a buyer, lessee, or debtor against a creditor for an excess charge, other violation of this Article, or civil penalty, or a claim against a buyer, lessee, or debtor for default or breach of a duty imposed by this Article, if disputed in good faith, may be settled by agreement.

> (3)     A claim, whether or not disputed against a buyer, lessee or debtor may be settled for less value than the amount claimed.

> (4)     A settlement in which the buyer, lessee, or debtor waives or agrees to forego rights or benefits under this Article is invalid if the court as a matter of law finds the settlement to have been unconscionable at the time it was made. The competence of

the buyer, lessee, or debtor, any deception or coercion practiced upon him, the nature and extent of the legal advice received by him, and the value of the consideration are relevant to the issue of unconscionability.

41.     Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .  (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and *if the debtor has paid an excess charge the debtor has a right to a refund*. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) *If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.* No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award *reasonable attorney's fees* incurred by the debtor. . . . (Emphasis added)

42.     The excessive interest charges imposed by Defendant were willful.

43.     Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

44.     Plaintiff incorporates paragraphs 1-43.

45.     Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

46.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

47.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via a Opportunity Financial website (c)  at more than 36% interest (d) on or after a date two years prior to the filing of this action.

48.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

49.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

50.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendant engages in a practice of making and attempting to collect illegal loans.

51.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

52.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

53.     A class action is superior for the fair and efficient adjudication of this matter, in that:

       a.     Individual actions are not economically feasible.

b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

     i.     Statutory damages;

     ii.     Attorney's fees, expenses and costs; and

     iii.     Such other or further relief as is appropriate.

## COUNT II – RICO

54.     Plaintiff incorporates paragraphs 1-43.

55.     This claim is against Defendants Pamela D. Johnson and Todd G. Schwartz, who are the RICO "persons." 18 U.S.C. § 1964(3).

56.     Defendants Pamela D. Johnson and Todd G. Schwartz violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

57.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

58.     The means and methods by which Pamela D. Johnson and Todd G. Schwartz conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the loan company in the business  of lending money at usurious rates under the laws of numerous states, including Indiana, where the usurious rates charged were at least twice the enforceable rate (36%). Pamela D. Johnson and Todd G. Schwartz were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois law, but they actively participated in the conduct of the illegal lending enterprise anyway.

59.     According to the annual report on SEC Form 10-K filed by OppFi, Inc., the public parent of Opportunity Financial, LLC, for the year ending Dec. 31, 2022 (original page 36), "lending

programs that involve originations by a bank in reliance on origination-related services being provided by non-bank lending platforms and/or program managers are subject to potential litigation and government enforcement claims based on 'rent-a-charter' or 'true lender' theories, particularly where such programs involve the subsequent sale of such loans or interests therein to the platform." The report was signed by Pamela D. Johnson and Todd G. Schwartz.

60.     Opportunity Financial, LLC is an "enterprise" engaged in, and whose activities affect, interstate commerce, in that it makes loans via the Internet.

61.     Defendants Pamela D. Johnson and Todd G. Schwartz are associated with this enterprise, in that they direct the making and collection of loans by Opportunity Financial, LLC.

62.     The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities

63.     The lending enterprise operates through ACH transactions, such as those involving the payments by Plaintiff. These ACH transactions involve interstate commerce.

64.     The lending enterprise operates through a website, https://www.oppfi.com/. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

65.     As alleged above, Pamela D. Johnson and Todd G. Schwartz violated §1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. §1962(c).

66.     In operating and conducting the affairs of the enterprise, Pamela D. Johnson and Todd G. Schwartz used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

67.     The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme to make illegal

loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state law.

68.     The scheme began no later than 2018 and continues to date, and will occur repeatedly in the future to the detriment of Indiana consumers.

69.     Plaintiff was deprived of money as a result of the violations of 18 U.S.C. §1962(c) by, among other things, the payment of unlawful debt to the enterprise.

## CLASS ALLEGATIONS

70.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

71.     The class consists of: (a) all persons with Indiana addresses, (b) for whom a loan was made via an Opportunity Financial, LLC website, (c) which loan was made on or after a date four years prior to the filing of suit.

72.     Plaintiff may alter the above class definition to conform to developments in the case and discovery.

73.     There are more than 100 class members. The class is so numerous that joinder of their members is not practicable.

74.     There are questions of law and fact common to members of the class, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

     a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

     b.     Whether Opportunity Financial, LLC is an "enterprise."

     c.     Whether Defendants Pamela D. Johnson and Todd G. Schwartz are associated with Opportunity Financial, LLC.

     d.     Whether Defendants Pamela D. Johnson and Todd G. Schwartz conducted or participated in the affairs of Opportunity Financial, LLC through a pattern of making and collecting unlawful loans.

75. Plaintiff will fairly and adequately represent the members of the class. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

76. Plaintiff's claims are typical of the claims of the members of the class. All are based on the same factual and legal theories.

77. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a. Individual actions are not economically feasible.

      b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i. Treble damages;

      ii. Attorney's fees, litigation expenses and costs of suit; and

      iii. Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Keelan D. Kane
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any  recovery herein for 1/3 or such amount as a court awards.   All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\41087\Pleading\Complaint DAE 9-27-24_Pleading.WPD